# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| **CARLA MAXWELL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Case No. 4:11CV 1596 JAR(LMB)** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Carla Maxwell for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act. The cause was referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a Brief in Support of Plaintiff's Complaint. (Document Number 16). Defendant has filed a Brief in Support of the Answer. (Doc. No. 20).

## Procedural History

On October 1, 2009, plaintiff filed her application for benefits, claiming that she became unable to work due to her disabling condition on April 1, 2009.[1] (Tr. 149-55). This claim was

---

[1] At the administrative hearing, plaintiff amended her alleged onset date to May 2, 2009. (Tr. 11, 31).

denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated December 13, 2010. (Tr. 97-102, 11-23). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on July 28, 2011. (Tr. 7, 1-5). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A. ALJ Hearing

Plaintiff's administrative hearing was held on November 30, 2010. (Tr. 29). Plaintiff was present and was represented by counsel. (Id.). Also present was Jim Israel, vocational expert. (Tr. 29).

Plaintiff's attorney indicated that plaintiff was amending her alleged onset date to May 1, 2009. (Tr. 31). Plaintiff's attorney stated that the evidence from plaintiff's psychiatrist, Dr. Vadim Baram, reveals that plaintiff's functional capacity falls below competitive levels. (Id.).

The ALJ examined plaintiff, who testified that she was twenty-five years of age. (Tr. 32). Plaintiff stated that she was five-feet, five-inches tall, and weighed 210 pounds. (Id.). Plaintiff testified that she had gained about twenty-five pounds because she had been depressed. (Id.).

Plaintiff stated that she dropped out of school in the eleventh grade. (Tr. 33). Plaintiff testified that she earned her GED in 2004. (Id.). Plaintiff stated that she took special behavioral classes when she was in school. (Id.).

Plaintiff testified that she received vocational training in carpentry through a Youth Build program. (Id.). Plaintiff stated that she completed this program in 2007, and received a

certificate.  (Id.).  Plaintiff testified that she had worked as a carpenter.  (Tr. 34).

Plaintiff stated that she was not working at the time of the hearing.  (Id.).  Plaintiff testified that she was employed at an "at-home" position, and that she planned to work one or two hours a day.  (Id.).  Plaintiff stated that the company did not have any work ready for her at the time of the hearing, although she planned on working in the future.  (Id.).  Plaintiff testified that the company pays at a rate of seventeen cents per "talk minute."  (Id.).  Plaintiff stated that she started her employment with this company on November 17, 2010.  (Tr. 35).

Plaintiff testified that she worked at Liveops, a customer service position, from approximately September 2010 to October 2010.  (Id.).  Plaintiff stated that she earned twenty-five cents a minute at this position, which was also an at-home job.  (Id.).  Plaintiff testified that she earned an average of about $10 to $20 a week at this position.  (Id.).  Plaintiff stated that she left this position because she was depressed and was unable to handle the work.  (Tr. 36).

Plaintiff stated that she worked at Teletech, answering telephone calls for Best Buy, for about one month in November 2009.  (Id.).  Plaintiff testified that she left this position because she became depressed.  (Id.).

Plaintiff stated that she worked at Today Staffing as a mail sorter in early 2009.  (Id.).  Plaintiff testified that this was a temporary job.  (Id.).

Plaintiff stated that she worked for Wested Home answering telephone calls for infomercials.  (Tr. 37).  Plaintiff testified that she left this position because she was depressed.  (Id.).

Plaintiff stated that she worked for UPS only during the training period.  (Id.).  Plaintiff testified that she left this position because it was too difficult, both mentally and physically.  (Id.).

Plaintiff stated that the position involved lifting heavy boxes and stacking them. (Id.). Plaintiff testified that the position was stressful for her because it was too repetitive. (Tr. 38).

Plaintiff stated that she worked for Today Staffing sorting mail. (Id.). Plaintiff testified that this was just a two-week-long temporary job. (Id.).

Plaintiff testified that she worked for the Housing Authority. (Id.). Plaintiff stated that she received property training at this position. (Id.).

Plaintiff testified that she worked for the Carpenters Health and Welfare building houses in approximately 2005. (Tr. 38-39). Plaintiff stated that she left this position when she was laid off. (Tr. 39). Plaintiff testified that she tried unsuccessfully to find another job as a carpenter. (Id.).

Plaintiff stated that she worked as a carpenter building houses for BAM Construction Company. (Id.). Plaintiff testified that she was a member of a union at this position. (Tr. 40). Plaintiff stated that she was laid off from this position in the winter. (Tr. 41). Plaintiff testified that she was on a hiring list through the union, but was never hired. (Id.).

Plaintiff stated that she worked for Home Depot stocking at night. (Tr. 41). Plaintiff testified that she left this position after a week because she was depressed and tired from working at night. (Id.).

Plaintiff stated that she worked at Long John Silver's as a cook and cashier for a year in 2002. (Tr. 42). Plaintiff testified that this was her longest job. (Id.). Plaintiff stated that she was fired from this position. (Id.).

Plaintiff testified that she was unable to work because she became depressed easily. (Id.).

Plaintiff stated that she suffered from bipolar I disorder,[2] which caused her to experience highs and lows. (Id.). Plaintiff testified that she experienced episodes of depression, which lasted three to four months. (Id.). Plaintiff stated that she had occasional suicidal thoughts during a depressive episode. (Id.). Plaintiff testified that she also experienced manic episodes during which she became frustrated and paranoid. (Id.). Plaintiff stated that it was difficult for her to leave the house, concentrate, and even take care of herself. (Id.). Plaintiff testified that she was unable to concentrate at work because she became frustrated and felt really down. (Tr. 43).

Plaintiff stated that her depressive episodes lasted approximately three months, and her manic episode lasted about two weeks. (Tr. 43). Plaintiff testified that she also experienced "in between" episodes during which she was normal. (Id.). Plaintiff stated that these normal periods lasted between one to three months. (Id.).

Plaintiff testified that she was seeing Dr. Baram, who prescribed Geodon,[3] Celexa,[4] and Trazodone.[5] (Id.). Plaintiff stated that she took Geodon twice a day, and that she took Trazodone and Celexa once a day. (Tr. 44). Plaintiff testified that her medications worked somewhat, but she was still depressed. (Id.). Plaintiff stated that she did not experience any side effects from her medications. (Id.).

---

[2]An affective disorder characterized by the occurrence of alternating (e.g., mixed, manic, and major depressive) episodes. See Stedman's Medical Dictionary, 568 (28th Ed. 2006).

[3]Geodon is an antipsychotic drug indicated for the treatment of schizophrenia. See Physician's Desk Reference (PDR), 2521(63rd Ed. 2009).

[4]Celexa is an antidepressant drug indicated for the treatment of depression. See PDR at 1161.

[5]Trazodone is an antidepressant drug indicated for the treatment of depression and other mood disorders. See WebMD, http://www.webmd.com/drugs (last visited June 22, 2012).

Plaintiff testified that she was hospitalized for a week in February 2010 because she had suicidal thoughts and wanted to harm herself with a gun. (Tr. 45). Plaintiff stated that she was also hospitalized for one-week periods in 2008 and 2009. (Id.). Plaintiff testified that she was hospitalized as a child. (Id.).

Plaintiff stated that she experienced difficulty concentrating. (Tr. 46). Plaintiff testified that it was really difficult for her to stay on task. (Id.).

Plaintiff stated that she watched television, although she was unable to sit through an entire program because she had to get up and do something. (Id.). Plaintiff testified that she played computer games for short periods. (Id.). Plaintiff stated that she read occasionally for ten to fifteen-minute periods. (Id.).

Plaintiff testified that she had difficulty dealing with people, and that she tried to avoid going out. (Tr. 47). Plaintiff stated that she felt paranoid when she was around crowds. (Id.). Plaintiff testified that she did not have any friends other than her mother. (Id.). Plaintiff stated that she got along well with her mother. (Id.).

Plaintiff testified that she experienced difficulty with her memory. (Id.). Plaintiff stated that she frequently forgot to brush her teeth and bathe. (Id.).

Plaintiff testified that, on a typical day, she wakes up, gets her son ready for school, comes back home, and does not do much of anything the rest of the day. (Tr. 48). Plaintiff stated that she occasionally visits her mother at her place of employment, and occasionally eats lunch with her mother. (Id.). Plaintiff testified that she only shops when she is in a manic state, at which time she shopped excessively. (Id.).

Plaintiff testified that her son was four years old, and that he lived with her in an

apartment. (Id.). Plaintiff stated that she and her son had been staying the night at plaintiff's mother's house daily for about nine months because plaintiff was too depressed to care for her son. (Id.). Plaintiff stated that her mother's house was approximately one to two blocks from her apartment. (Id.). Plaintiff testified that her mother did all of the household chores. (Tr. 49). Plaintiff stated that her mother had to remind her to brush her son's teeth. (Id.).

Plaintiff's attorney then examined plaintiff, who testified that she was sexually abused by her father when she was a child. (Tr. 50). Plaintiff stated that she told her mother about the abuse, and that plaintiff's father was incarcerated. (Id.). Plaintiff testified that she experienced nightmares and difficulty sleeping at the time of the hearing. (Id.). Plaintiff stated that her mother sent her to a psychiatrist when she was a child. (Tr. 51). Plaintiff testified that she had problems in school. (Id.).

Plaintiff stated that she experienced paranoia. (Id.). Plaintiff testified that she sometimes believed that the police or the government was after her, and that she was afraid of black or white SUVs. (Id.). Plaintiff stated that she did not like being in crowds. (Id.).

Plaintiff testified that she had difficulty sleeping at night because she had racing thoughts. (Id.). Plaintiff stated that she slept approximately four hours in an average night. (Id.).

The ALJ examined the vocational expert, Mr. Israel, who testified that plaintiff had had multiple short-term jobs that did not have enough traction to learn those jobs. (Tr. 54). Mr. Israel stated that the exception was plaintiff's carpentry job, which he described as a semi-skilled carpenter/construction worker. (Id.). Mr. Israel testified that plaintiff worked in customer service, telemarketing, and general clerical jobs for short periods. (Id.). Mr. Israel stated that plaintiff worked as a cook/cashier in a fast food restaurant for a significant period. (Id.). Mr.

Israel testified that plaintiff also worked as a sorter and material handler. (Tr. 55). Mr. Israel stated that plaintiff had no transferable skills. (Id.).

The ALJ asked Mr. Israel to assume a hypothetical claimant with plaintiff's background and the following limitations: capable of performing at all exertional levels; limited to simple, repetitive tasks; only occasional interaction with the public; no transactional interaction with the public; and limited to frequent interaction with co-workers. (Id.). Mr. Israel testified that the individual could perform plaintiff's past work as a sorter and material handler, which was light and unskilled. (Id.). Mr. Israel stated that the individual could also work as a packer, which was medium in exertion. (Tr. 56).

The ALJ next asked Mr. Israel to assume all of the limitations included in the first hypothetical with the additional limitation of only occasional interaction with co-workers. (Id.). Mr. Israel testified that the individual would still be capable of working as a sorter and a packer, although the number of jobs may be reduced. (Id.). Mr. Israel stated that approximately 6,500 sorter positions exist in Missouri. (Id.).

The ALJ then asked Mr. Israel to assume the same limitations as the second hypothetical with the additional limitation of only occasional interaction with supervisors. (Tr. 58). Mr. Israel testified that the individual would still be capable of performing work as a sorter, although the number of positions would be reduced by approximately fifteen percent. (Id.).

The ALJ next asked Mr. Israel to assume the same limitations included in the previous hypotheticals with the additional limitation of no interaction with co-workers at all. (Id.). Mr. Israel testified that the individual would be unable to perform the jobs identified or any other job because contact with people was inevitable in any position. (Tr. 59).

Plaintiff's attorney then questioned Mr. Israel. Plaintiff's attorney asked Mr. Israel to assume the limitations found by Dr. Baram on July 31, 2010. (Tr. 60). Mr. Israel testified that an individual with these limitations would be unable to perform competitive employment on a sustained basis due to the cumulative effect of the serious limitations. (Id.). Mr. Israel also stated that four absences from work a month would not be tolerated by an employer. (Tr. 61).

## B.    Relevant Medical Records

The record reveals that plaintiff saw Dale J. Anderson, M.D. on January 5, 2009, at which time plaintiff reported that her suicidal thoughts had decreased in frequency, although she was becoming angry faster than normal for her, causing arguments with her mother. (Tr. 267). Plaintiff also complained of racing thoughts, decreased sleep, and paranoid thoughts of the government being after her. (Id.). Dr. Anderson prescribed Lexapro,[6] Depakote,[7] and Abilify.[8] (Id.). On January 12, 2009, plaintiff reported that she had attended a social gathering for about fifteen minutes, which was an improvement over the past. (Tr. 268). Plaintiff reported that her suicidal thoughts had decreased from "constantly" to about twice a week. (Id.). Plaintiff's sleep and racing thoughts had improved, but there was no change in her paranoid thoughts of the government being after her. (Id.). Dr. Anderson prescribed Ritalin,[9] and increased plaintiff's

---

[6]Lexapro is an antidepressant drug indicated for the treatment of major depressive disorder and generalized anxiety disorder. See PDR at 1175.

[7]Depakote is indicated for the treatment of manic or mixed episodes associated with bipolar disorder, with or without psychotic features. See PDR at 423.

[8]Abilify is an antipsychotic drug indicated for the treatment of schizophrenia, bipolar disorder, and major depressive disorder. See PDR at 881.

[9]Ritalin is indicated for the treatment of ADHD. See WebMD, http://www.webmd.com/drugs (last visited June 22, 2012).

dosage of Abilify. (Id.). On January 20, 2009, plaintiff reported that she did not feel sad, but still experienced paranoid thoughts, and suicidal thoughts with no plan. (Tr. 266). On January 27, 2009, plaintiff reported a decrease in frequency and intensity of the paranoid thoughts, and reported experiencing suicidal thoughts one time in the past week. (Tr. 269). On February 4, 2009, plaintiff reported that she continued to experience paranoid thoughts triggered by observing red cars, and that she had experienced suicidal thoughts on one occasion. (Tr. 265). On February 18, 2009, plaintiff reported improvement in her mood, sleep, and paranoia. (Tr. 270). On March 10, 2009, plaintiff reported that she still believed the government was after her half of the time, but it was much less intense. (Tr. 264). On March 31, 2009, plaintiff reported that she had been free from paranoid thoughts, although she had been experiencing occasional episodes of hyperactivity. (Tr. 271). On April 28, 2009, plaintiff denied paranoid thoughts, but reported that her mood was moderately depressed. (Tr. 263). On May 26, 2009, plaintiff indicated that her mood had been depressed, and that she wished she were not living, although she had no thoughts of suicide. (Tr. 272). Plaintiff also reported that she felt that her roommate could read her mind. (Id.). On June 18, 2009, plaintiff reported that she was depressed, felt hopeless, and felt like dying, although she denied suicidal or homicidal thoughts. (Tr. 262). Plaintiff also continued to experience delusional thoughts that her roommate could read her mind. (Id.). Dr. Anderson started plaintiff on Lithium.[10] (Id.). On July 20, 2009, plaintiff reported improvement in her mood with no suicidal thoughts. (Tr. 273). On August 26, 2009, plaintiff reported that she would like to die, and that if she had a gun, she would "probably be gone right now." (Tr. 261).

_____

[10]Lithium is indicated for the treatment of bipolar disorder. See WebMD, http://www.webmd.com/drugs (last visited June 22, 2012).

Plaintiff had stopped taking her medications one month prior. (Id.). Dr. Anderson admitted plaintiff to St. Mary's Hospital to stabilize her on medication. (Id.).

Plaintiff was admitted at St. Mary's Hospital on August 26, 2009. (Tr. 233-36). Upon mental status examination, Dr. Anderson noted that plaintiff's thought content was positive for suicidal thoughts, and plaintiff's insight and judgment were poor. (Tr. 235). Dr. Anderson diagnosed plaintiff with bipolar disorder[11] (depressed), ADHD,[12] rule out personality disorder,[13] and assessed a current GAF score[14] of 25,[15] with the highest GAF score in the past year of 55.[16] (Tr. 236). It was noted that plaintiff was a survivor of physical and sexual abuse. (Id.). Dr.

_____

[11]An affective disorder characterized by the occurrence of alternating manic, hypomanic, or mixed episodes and with major depressive episodes. See Stedman's at 568.

[12]Attention deficit hyperactivity disorder ("ADHD") is a behavioral disorder manifested by developmentally inappropriate degrees of inattentiveness (short attention span, distractability, inability to complete tasks, difficulty in following directions), impulsiveness (acting without due reflection), and hyperactivity (restlessness, fidgeting, squirming). Stedman's at 568.

[13]General term for a group of behavioral disorders characterized by usually lifelong ingrained maladaptive patterns of subjective internal experience and deviant behavior, lifestyle, and social adjustment, which patterns may manifest in impaired judgment, affect, impulse control and interpersonal functioning. Stedman's at 570.

[14]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[15]A GAF score of 21 to 30 indicates that "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)." DSM-IV at 32.

[16]A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 32.

Anderson indicated that plaintiff would be restarted on medication and stabilized sufficiently to be treated on an outpatient basis. (Id.).

Plaintiff was admitted at DePaul Health Center Outpatient Behavioral Health Services from September 2, 2009, through September 18, 2009. (Tr. 238-59). Plaintiff's initial diagnosis was bipolar disorder, with a GAF score of 32.[17] (Tr. 239). Plaintiff reported that she initially wanted to shoot herself but no longer wanted to do this, and instead wanted help. (Tr. 242). Plaintiff attended group and individual therapy. (Id.). Plaintiff saw Dr. Anderson on September 8, 2009, at which time plaintiff had no suicidal thoughts or delusions. (Tr. 274). Plaintiff reported that she was learning to express her feelings, and was interested in outside activities. (Id.).

Plaintiff saw Dr. Anderson on September 22, 2009, at which time plaintiff denied suicidal thoughts, although she indicated that she had thoughts of dying accidentally and had mixed feelings about this. (Tr. 260). Plaintiff also reported episodes of increased energy where she stayed up all night on the internet. (Id.). Plaintiff indicated that she had been trying to take her medication, although she occasionally missed dosages. (Id.).

Plaintiff presented to BJC Behavioral Services on November 10, 2009. (Tr. 275). It was noted that plaintiff was a re-admit to BJC, and that she was active from November 2003 through July 2006. (Id.). Plaintiff requested assistance with her issues and with pursuing independent housing and other resources. (Id.). Plaintiff reported that her medications made her slow and

_____

[17]A GAF score of 31-40 denotes some impairment in reality testing or communication (e.g., speech is at time illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work). DSM-IV at 32.

prevented her from working, so she occasionally skipped them. (Id.). Plaintiff was not sleeping

well, and continued to think that the government was after her. (Id.). Plaintiff had been treated

for ADHD since the age of seven, and lived in residential homes from the ages of ten to seventeen

because of her behavior problems. (Tr. 276). Plaintiff reported periods of depression and periods

of elevated mood. (Id.). Plaintiff reported overspending and anger outbursts, with her most

recent anger outburst occurring one week prior. (Id.). Plaintiff indicated that her biological

father sexually abused her at the age of four, and her step-father physically abused her. (Tr. 277).

Plaintiff reported that she used to "carve on herself," because she liked the pain, and last cut

herself in 2009. (Tr. 282). Upon mental status examination, plaintiff's affect was depressed, her

flow of thought was logical and sequential, and she spoke at a normal rate and rhythm. (Tr. 283).

Plaintiff had a fixed delusion that the government was monitoring her, which was triggered by red

cars. (Id.). Plaintiff had some OCD[18] behaviors. (Id.). Plaintiff reported that she has thought

that she has had super strength and that a roommate could read her mind. (Id.). It was noted that

plaintiff had a long history of intense mood swings and emotional disregulation. (Tr. 284).

Plaintiff was diagnosed with bipolar I disorder, most recent episode depressed with psychotic

---

[18]Obsessive-compulsive disorder ("OCD") is a type of anxiety disorder the essential
features of which include recurrent obsessions, persistent intrusive ideas, thoughts, impulses or
images, or compulsions (repetitive, purposeful, and intentional behaviors performed to decrease
anxiety in response to an obsession). Stedman's at 570.

features; history of ADHD; rule out PTSD;[19] rule out borderline personality disorder;[20] with a GAF score of 50.[21]  (Tr. 285).

On December 10, 2009, plaintiff saw Muhammad Baber, M.D., Psychiatrist, at BJC Behavioral Services, for an evaluation.  (Tr. 311-13).  Dr. Baber stated that plaintiff presented a "quite puzzling picture," which seemed evident due to the different diagnoses she had received as well as the complicated regimen she had been receiving.  (Tr. 311).  Dr. Baber noted that plaintiff had been partially compliant at best with regard to her medications.  (Id.).  Upon mental status examination, Dr. Baber noted that plaintiff's affect was restricted and she was not able to get engaged in meaningful interactive conversation, her psychomotor activity and speech were decreased, her mood was depressed, and her affect was blunted/restricted in range to the point of flattening.  (Tr. 312).  Plaintiff reported experiencing suicidal thoughts all the time, but denied having any intent or plan.  (Id.).  Plaintiff's concentration and memory appeared to be low, and her insight and judgment were limited.  (Id.).  Dr. Baber diagnosed plaintiff with mood disorder

---

[19]Posttraumatic stress disorder ("PTSD") is the development of characteristic long-term symptoms following a psychologically traumatic event that is generally outside the range of usual human experience; symptoms include persistently re-experiencing the event and attempting to avoid stimuli reminiscent of the trauma, numbed responsiveness to environmental stimuli, a variety of autonomic and cognitive dysfunctions, and dysphoria.  Stedman's at 570.

[20]An enduring and pervasive pattern that begins by early adulthood and is characterized by impulsivity and unpredictability, unstable interpersonal relationships, inappropriate or uncontrolled affect, especially anger, identity disturbances, rapid shifts of mood, suicidal acts, self-mutilations, job and marital instability, chronic feelings of emptiness or boredom, and intolerance of being alone.  Stedman's at 568.

[21]A GAF score of 41 to 50 indicates "serious symptoms" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV at 32.  A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  Id. at 32.

NOS[22]/anxiety disorder NOS,[23] rule out PTSD, ADHD by history, bipolar disorder by history, borderline personality disorder by history, and a GAF score of 55. (Tr. 313). Dr. Baber started plaintiff on Lithium. (Id.).

R. Cottone, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique on December 21, 2009. (Tr. 286-97). Dr. Cottone found that plaintiff had organic mental disorders, affective disorders, and personality disorders. (Tr. 286). Dr. Cottone expressed the opinion that plaintiff had a marked limitation in her ability to maintain social functioning; moderate limitations in her ability to perform activities of daily living and her ability to maintain concentration, persistence or pace; and one or two episodes of decompensation, each of extended duration. (Tr. 294). Dr. Cottone stated, "[t]his looks to be a very fragile claimant with poor compliance that appears to be disability related. She has delusional thinking...her social functioning is seriously impaired. There appear to be moderate ADL limits." (Tr. 296).

Dr. Cottone completed a Mental Residual Functional Capacity Assessment, in which he expressed the opinion that plaintiff was markedly limited in her ability to understand and remember detailed instructions, carry out detailed instructions, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 298-99). Dr. Cottone found that plaintiff was moderately limited in her ability to maintain

---

[22]This category includes disorders with mood symptoms that do not meet the criteria for any specific Mood Disorder and in which it is difficult to choose between Depressive Disorder Not Otherwise Specified and Bipolar Disorder Not Otherwise Specified. DSM-IV at 375.

[23]This category includes disorders with prominent anxiety or phobic avoidance that do not meet criteria for any specific anxiety disorder, adjustment disorder with anxiety, or adjustment disorder with mixed anxiety and depressed mood. DSM-IV at 444.

attention and concentration for extended periods, work in coordination with others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and set realistic goals or make plans independently of others. (Id.). Dr. Cottone found that plaintiff must avoid work involving intense or extensive interpersonal interaction, handling complaints of dissatisfied customers, close proximity to co-workers, and public contact. (Tr. 300). He stated that plaintiff was able to make simple work-related judgments and adjust adequately to ordinary changes in work routine or setting. (Id.). Finally, Dr. Cottone stated that plaintiff would be easily distracted by others, would have difficulty relating to co-workers and supervisors, and would likely exhibit behavioral extremes inappropriate to a worksite. (Id.).

Plaintiff saw Dr. Baber on December 24, 2009, at which time plaintiff reported that she was sleeping a lot, her energy level was low, she felt hopeless and helpless, was irritable, and had racing thoughts about death. (Tr. 314). Plaintiff stated that "life is not worth living." (Id.). Upon mental status examination, plaintiff was a little more cooperative and was less guarded then at her last visit, her affect was restricted but less so, and plaintiff was able to engage in interactive conversation. (Id.). Plaintiff reported experiencing suicidal thoughts at night most days but denied any intent or plan. (Id.). Plaintiff's concentration was low, her memory was fair, and her insight and judgment were limited. (Tr. 314-15). Dr. Baber's diagnosis remained unchanged. (Tr. 314). Dr. Baber stated that plaintiff seemed to have improved, as she was less irritable and there was a decrease in the flattening of her affect. (Tr. 315). He increased plaintiff's dosage of Lithium. (Id.).

Plaintiff saw Dr. Baber on January 8, 2010, at which time plaintiff reported that she slept a lot, her energy was low, she felt hopeless and helpless at times, was irritable, and experienced occasional violent thoughts. (Tr. 316). Upon mental status examination, plaintiff was guarded and had a restricted and irritable affect. (Id.). Dr. Baber stated that plaintiff may have regressed a little lately, and noted that plaintiff was not taking her Lithium regularly. (Id.). His diagnosis remained unchanged. (Tr. 316).

Plaintiff saw Dr. Baber on February 5, 2010, at which time plaintiff was "quite irritable," claimed that Dr. Baber was not treating her ADHD, and requested medication for her ADHD. (Tr. 318). Upon mental status examination, plaintiff was guarded, her affect was restricted, she had limited eye contact, and she was irritable. (Id.). Plaintiff stormed out of the office and indicated that she wanted a different doctor when Dr. Baber informed her that treatment of ADHD with stimulants could worsen the bipolar disorder. (Id.). Dr. Baber indicated that he advised plaintiff to get her Lithium level checked, but she walked out without making an appointment. (Id.).

Plaintiff was admitted to St. Mary's Health Center from February 23, 2010, to February 27, 2010, after she reported suicidal thoughts. (Tr. 305-310). Vadim Baram, M.D., evaluated plaintiff on February 24, 2010, at which time plaintiff reported that she was depressed, had thoughts of harming herself, was anxious a lot, slept a lot, lacked energy, and was isolative. (Tr. 308). Plaintiff had been neglecting her self care and was unable to remember the last time she took a shower. (Id.). Upon mental status examination, plaintiff was friendly and pleasant, her affect was restricted, her mood was "so-so," and her insight and judgment were poor. (Tr. 309). Dr. Baram diagnosed plaintiff with bipolar affective disorder type I, current episode depressed,

without psychosis; history of borderline personality disorder; and a GAF score of 20.[24] (Id.).

During her hospitalization, plaintiff attended individual and group therapy, psychotherapy, and medication management. (Tr. 305). Upon discharge, Dr. Baram diagnosed plaintiff with bipolar affective disorder, type I, currently depressed without psychosis; history of borderline personality disorder; and a GAF score of 53. (Tr. 305). Dr. Baram prescribed Lexapro and Geodon, and indicated that he would see plaintiff on an outpatient basis. (Id.).

Plaintiff saw Dr. Baram on March 16, 2010, at which time Dr. Barm described plaintiff's mood as fair, and her affect as flat. (Tr. 322). Dr. Baram diagnosed plaintiff with bipolar I disorder, most recent episode depressed, severe without psychotic features. (Id.). On April 14, 2010, plaintiff reported that she was a "little better." (Tr. 323). Plaintiff's mood was fair, and her affect was flat. (Id.). Dr. Baram increased plaintiff's dosage of Lexapro. (Id.). On May 25, 2010, plaintiff reported paranoid delusions that the government was following her triggered by certain car colors. (Tr. 324). Dr. Baram stated that plaintiff thought everything was a conspiracy. (Id.). Dr. Baram changed plaintiff's diagnosis to: bipolar I disorder, most recent episode depressed, severe without psychotic features vs. schizoaffective disorder.[25] (Id.). On June 21, 2010, plaintiff reported that she felt better, and that she was not so paranoid, although she thought about cars following her. (Tr. 325). Dr. Baram diagnosed plaintiff with schizoaffective

---

[24]A GAF score of 11 to 20 denotes "[s]ome danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute)." DSM-IV at 32.

[25]An illness manifested by an enduring major depressive, manic, or mixed episode along with delusions, hallucinations, disorganized speech and behavior, and negative symptoms of schizophrenia. In the absence of a major depressive, manic, or mixed episode, there must be delusions or hallucinations for several weeks. Stedman's at 570.

disorder.  (Id.).  On July 20, 2010, plaintiff reported that she was not sleeping well, and requested

medication for ADHD.  (Tr. 326).  Plaintiff's mood was fair and her affect was flat.  (Id.). Dr.

Baram increased plaintiff's dosage of Geodon, and prescribed Strattera[26] and Trazodone.  (Id.).

Dr. Baram completed a Mental Residual Functional Capacity Questionnaire on July 31,

2010.  (Tr. 328-32).  Dr. Baram indicated that plaintiff's diagnoses were schizoaffective disorder

and attention deficit disorder, and that plaintiff's prognosis was "guarded."  (Tr. 328).  Dr. Baram

expressed the opinion that plaintiff was unable to meet competitive standards in the following

mental abilities: complete a normal work day and work week without interruptions from

psychologically-based symptoms, and deal with normal work stress.  (Tr. 329-30).  Dr. Baram

found that plaintiff was seriously limited but not precluded in the following mental abilities:

remember work-like procedures, maintain attention for two-hour segments, work in coordination

with or proximity to others without being unduly distracted, make simple work-related decisions,

perform at a consistent pace without an unreasonable number and length of rest periods, get along

with co-workers or peers without unduly distracting them or exhibiting behavioral extremes,

respond appropriately to changes in a routine work setting, be aware of normal hazards and take

appropriate precautions, set realistic goals or make plans independently of others, deal with stress

of semi-skilled and skilled work, interact appropriately with the general public, maintain socially

appropriate behavior, adhere to basic standards of neatness and cleanliness, travel in unfamiliar

places, and use public transportation.  (Id.).  As support for these findings, Dr. Baram stated that

it is difficult for plaintiff to concentrate and maintain a reasonable pace, and that plaintiff's sleep

impairment and paranoid delusions interfere with her ability to function.  (Tr. 330).  Dr. Baram

---

[26]Strattera is indicated for the treatment of ADHD.  See PDR at 1865.

stated that plaintiff has a tendency to decompensate in a school setting, and that he had significant doubts that she would be able to make decisions in any kind of job. (Id.). Dr. Baram stated that plaintiff needed family supervision because her delusions and impaired reality testing interfered with her normal functioning. (Id.). Dr. Baram found that plaintiff would be absent from work four times a month due to her impairments. (Tr. 331). Dr. Baram stated that plaintiff had a significant degree of psychopathology where affective disturbances coexisted with psychotic delusions and paranoia, and that these delusions may significantly interfere in communications with peers and supervisors. (Id.).

Plaintiff saw Dr. Baram on September 1, 2010, at which time she complained she was unable to sleep at night. (Tr. 333). Plaintiff's mood was fair and her affect was flat. (Id.). Plaintiff's diagnosis remained unchanged. (Id.). On October 15, 2010, plaintiff reported difficulty sleeping, and difficulty differentiating real from unreal. (Id.). Dr. Baram indicated that plaintiff was experiencing delusions. (Id.).

### The ALJ's Determination

The ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2012.

2. The claimant has not engaged in substantial gainful activity since April 1, 2009, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: a bipolar disorder, depression, and an attention deficit hyperactivity disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with non-exertional limitations. She is limited to simple repetitive tasks. She must have only occasional interaction with the public; however, she must avoid all transactional interaction with the public. Finally, she must have only occasional interaction with co-workers.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on October 16, 1985 and was 23 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 1, 2009, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 14-22).

The ALJ's final decision reads as follows:

Based on the application for a period of disability and disability insurance benefits filed on October 1, 2009, the claimant is not disabled under sections 216(I) and 223(d) of the Social Security Act.

Based on the application for supplemental security income filed on October 2, 2009, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 22).

<h2 align="center"><strong>Discussion</strong></h2>

**A.**    <strong><u>Standard of Review</u></strong>

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  <u>See</u> <u>Ostronski v. Chater</u>, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  <u>See</u> <u>Roberts v. Apfel</u>, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  <u>See</u> <u>Kelley v. Callahan</u>, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  <u>See</u> <u>Robinson v. Sullivan</u>, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  <u>See</u> <u>Johnson v. Chater</u>, 87 F.3d 1015, 1017 (8th Cir. 1996).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  <u>Burress v. Apfel</u>, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry." <u>Id.</u>

**B.**    <strong><u>The Determination of Disability</u></strong>

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant

has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the

physical and mental demands of the past work, the claimant is not disabled.  See id.  If the

claimant cannot perform his or her previous work, the final step involves a determination of

whether the claimant is able to perform other work in the national economy taking into

consideration the claimant's residual functional capacity, age, education and work experience.

See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if

s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains

upon the claimant until s/he adequately demonstrates an inability to perform previous work, at

which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform

other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

      The Commissioner has supplemented this five-step process for the evaluation of claimants

with mental impairments.  See 20 C.F.R. §§ 404.1520a (a), 416.920a (a).  A special procedure

must be followed at each level of administrative review.  See id.  Previously, a standard document

entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this

special procedure, had to be completed at each level and a copy had to be attached to the ALJ's

decision, although this is no longer required.  See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e),

416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758 (2000).  Application of the special procedures

required is now documented in the decision of the ALJ or Appeals Council.  See 20 C.F.R. §§

404.1520a (e), 416.920a (e).

      The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a,

416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms,

findings, functional limitations, and effects of treatment" in the case record to assist in the

determination of whether a mental impairment exists.  See 20 C.F.R. §§ 404.1520a (b) (1),

416.920a (b) (1).  If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace.  See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).  Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.  See id.  Next, the Commissioner must determine the severity of the impairment based on those ratings.  See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).  If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.  See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.  See id.  If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3); Pratt, 956 F.2d at 834-35; Jones v. Callahan, 122 F.3d 1148, 1153 n.5 (8th Cir. 1997).

## C.    **Plaintiff's Claims**

Plaintiff first argues that the ALJ erred in determining plaintiff's RFC.  Specifically, plaintiff contends that the findings of the ALJ are not supported by "some" medical evidence as required under the standards contained in Singh and Lauer.  Plaintiff argues that the ALJ erred in discrediting the opinion of plaintiff's treating psychiatrist, Dr. Baram, and in relying on the opinion of a non-examining state agency psychologist.  Plaintiff also contends that the

hypothetical question posed to the vocational expert was erroneous.

The ALJ made the following determination regarding plaintiff's RFC:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with non-exertional limitations. She is limited to simple repetitive tasks. She must have only occasional interaction with the public; however, she must avoid all transactional interaction with the public. Finally, she must have only occasional interaction with co-workers.

(Tr. 16).

A disability claimant's RFC is the most he or she can still do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1). In McCoy v. Schweiker, 683 F.2d 1138 (8th Cir. 1982) (en banc), the Eighth Circuit defined RFC as the ability to do the requisite work-related acts "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Id. at 1147. The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

Although assessing a claimant's RFC is primarily the responsibility of the ALJ, a "'claimant's residual functional capacity is a medical question.'" Lauer v. Apfel, 245 F.3d 700, 704 (quoting Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000)). The Eighth Circuit clarified in Lauer, 245 F.3d at 704, that "'[s]ome medical evidence,' Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam), must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace,' Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000)." Thus, an ALJ is "required to consider at least some supporting evidence from a professional." Id. See also Vossen v. Astrue, 612 F.3d

1011, 1016 (8th Cir. 2010) ("The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC."); Eichelberger, 390 F.3d at 591.

In determining plaintiff's RFC, the ALJ acknowledged that treating psychiatrist Dr. Baram completed a medical source statement in which he expressed the opinion that plaintiff would be unable to complete a normal workday or workweek without interruptions from her psychologically-based symptoms, or deal with normal work stress. (Tr. 18, 329-30). Dr. Baram found that plaintiff was seriously limited but not precluded in many other mental abilities. (Id.). Dr. Baram also indicated that plaintiff would be absent from work four times a month due to her impairments. (Tr. 331). Dr. Baram stated that plaintiff had a significant degree of psychopathology where affective disturbance coexisted with psychotic delusions and paranoia, and that these delusions may significantly interfere in communications with peers and supervisors. (Id.). The ALJ stated that Dr. Baram's assessment was "grossly inconsistent with his own treatment records and objective findings." (Tr. 18). The ALJ indicated that he was assigning greater weight to Dr. Baram's treatment notes than to his medical source statement. (Id.).

The ALJ has the role of resolving conflicts among the opinions of various treating and examining physicians. Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001). The ALJ may reject the conclusions of any medical expert, whether hired by the government or the claimant, if they are inconsistent with the record as a whole. Id. Normally, the opinion of the treating physician is entitled to substantial weight. Casey v. Astrue, 503 F.3d 687, 691 (8th Cir. 2007). The opinion of a consulting physician, who examines a claimant once, or not at all, generally receives very little weight. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). The opinion of an

examining physician is generally entitled to more weight than the opinion of a non-examining physician. 20 C.F.R. § 404.1527(d)(1).

Still, the opinion of the treating physician is not conclusive in determining disability status, and must be supported by medically acceptable clinical or diagnostic data. Casey, 503 F.3d at 691. The ALJ may credit other medical evaluations over the opinion of a treating physician if the other assessments are supported by better or more thorough medical evidence, or when the treating physician's opinions are internally inconsistent. Guilliams v. Barnhart, 393 F.3d 798, 803 (8th Cir. 2005); Cantrell v. Apfel, 231 F.3d 1104, 1107 (8th Cir. 2000). In determining how much weight to give a treating physician's opinion, the ALJ must consider the length of the treatment relationship and the frequency of examinations. Casey, 503 F.3d at 692.

In this case, the ALJ erred in discounting the findings of treating psychiatrist Dr. Baram. Dr. Baram began treating plaintiff during her February 2010 psychiatric hospitalization at St. Mary's Health Center. (Tr. 305-10). Dr. Baram saw plaintiff on an outpatient basis approximately monthly from her discharge through the date he provided his opinion in July 2010. The opinion of Dr. Baram, as plaintiff's treating psychiatrist, and a specialist in the area upon in which he provided an opinion, was entitled to substantial weight provided it was not inconsistent with other evidence. See Kelley v. Callahan, 133 F.3d 583, 588 (8th Cir. 1998) ("The Commissioner is encouraged to give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than the opinion of a source who is not a specialist.").

Dr. Baram's opinion was supported by his own treatment notes. Upon plaintiff's admission to St. Mary's Health Center in February 2010, plaintiff reported suicidal thoughts, was neglecting her self care, had a restricted affect, and poor insight and judgment. (Tr. 308-09). Dr.

Baram diagnosed plaintiff with bipolar disorder type I, current episode depressed, without psychosis; history of borderline personality disorder; and a GAF score of 20. (Tr. 309). At the time of plaintiff's discharge, Dr. Baram assessed a GAF score of 53. (Tr. 305). At plaintiff's monthly visits, Dr. Baram prescribed and adjusted plaintiff's medications, which included Lexapro, Geodon, Strattera, and Trazodone. (Tr. 305, 322-26). Dr. Baram consistently described plaintiff's mood as "fair," and her affect as "flat." (Tr. 322-26). On May 25, 2010, Dr. Baram noted that plaintiff reported paranoid delusions that the government was following her, and that plaintiff believed everything was a conspiracy. (Tr. 324). On June 21, 2010, plaintiff continued to report paranoid thoughts about cars following her. (Tr. 325). At this time, Dr. Baram changed plaintiff's diagnosis to schizoaffective disorder. (Id.). Although the ALJ found that Dr. Baram's opinion was "grossly inconsistent" with his own treatment records, Dr. Baram's treatment notes reveal that plaintiff reported paranoid delusions, which caused Dr. Baram to adjust her medications and change her diagnosis to schizoaffective disorder. As such, Dr. Baram's opinion that plaintiff experienced paranoid delusions that interfered with her ability to function is supported by Dr. Baram's own treatment notes.

Dr. Baram's findings are also consistent with the other medical evidence of record. Plaintiff consistently reported paranoid thoughts of the government being after her to her former treating psychiatrist, Dr. Anderson, whom she saw from January 2009 through September 2009. (Tr. 267, 268, 266, 265, 264). Plaintiff also reported delusions that she felt her roommate could read her mind. (Tr. 272, 262). In addition, plaintiff reported experiencing frequent suicidal thoughts. (Tr. 268, 266, 269, 265). Dr. Anderson prescribed Lexapro, Depakote, Abilify, and Lithium. (Id.). Dr. Anderson admitted plaintiff to St. Mary's Hospital on August 26, 2009, when

plaintiff indicated that she would take her life if she had a gun. (Tr. 261). Upon mental status examination, Dr. Anderson found that plaintiff's thought content was positive for suicidal thoughts, and plaintiff's insight and judgment were poor. (Tr. 235). Dr. Anderson diagnosed plaintiff with bipolar disorder (depressed), ADHD, rule out personality disorder, and assessed a current GAF score of 25, with the highest GAF score in the past year of 55. (Tr. 236).

Plaintiff started receiving psychiatric treatment at BJC Behavioral Services on November 10, 2009, at which time she reported that she was not sleeping well, and continued to think that the government was after her. (Tr. 275). Upon mental status examination, plaintiff's affect was depressed, plaintiff had a fixed delusion that the government was monitoring her, plaintiff reported that she has thought she has had super strength, and plaintiff reported that a roommate could read her mind. (Tr. 283). Plaintiff was diagnosed with bipolar I disorder, most recent episode depressed with psychotic features; history of ADHD; rule out PTSD; rule out borderline personality disorder; with a GAF score of 50 (Tr. 285). Plaintiff subsequently started seeing Dr. Baber at BJC Behavioral Services. Upon mental status examination on December 10, 2009, Dr. Baber noted that plaintiff's affect was restricted and she was not able to engage in meaningful interactive conversation, plaintiff's psychomotor activity and speech were decreased, plaintiff's mood was depressed, her affect was blunted/restricted in range to the point of flattening, and plaintiff's insight and judgment were limited. (Tr. 312). Dr. Baber diagnosed plaintiff with mood disorder NOS/anxiety disorder NOS, rule out PTSD, ADHD by history, bipolar disorder by history, borderline personality disorder by history, and a GAF score of 55. (Tr. 313). Dr. Baber started plaintiff on Lithium. (Id.).

The medical evidence of record, including Dr. Baram's own treatment notes, reveals that

plaintiff suffered significant psychiatric symptomology due to her mental impairments. Plaintiff consistently reported experiencing paranoid delusions that the government was monitoring her, both to Dr. Baram, and to prior physicians. Plaintiff was treated with many different psychotropic medications, and was given low GAF scores ranging from 20 to 55. Plaintiff was hospitalized due to suicidal thoughts on multiple occasions. As such, Dr. Baram's findings were supported by his own treatment notes and the other medical evidence of record.

The ALJ indicated that the December 21, 2009 opinion of state agency psychologist Dr. Cottone was consistent with the record as a whole, and did not contradict with the RFC formulated by the ALJ. (Tr. 20). Dr. Cottone expressed the opinion that plaintiff must avoid work involving intense or extensive interpersonal interaction, handling complaints of dissatisfied customers, close proximity to co-workers, and public contact. (Tr. 300). Dr. Cottone found that plaintiff was able to make simple work-related judgments and adjust adequately to ordinary changes in work routine or setting. (Id.).

The ALJ erred in discrediting the opinion of Dr. Baram, and relying on the findings of the state agency psychologist, Dr. Cottone. Dr. Cottone did not examine plaintiff. Rather, his opinion is based solely on a review of plaintiff's medical records. Under Singh, the opinion of a non-examining physician "does not generally constitute substantial evidence." Singh, 222 F.3d at 452. Further, Dr. Cottone reviewed the record in December 2009-prior to plaintiff's February 2010 hospitalization, and plaintiff's treatment with Dr. Baram. As such, Dr. Cottone did not have the benefit of Dr. Cottone's significant findings.

In determining plaintiff's RFC, the ALJ found that plaintiff's poor compliance with her medication regimen significantly undermined her credibility. (Tr. 19). The Eighth Circuit has

recognized that "a mentally ill person's noncompliance with psychiatric medications can be, and usually is, the 'result of [the] mental impairment [itself] and, therefore, neither willful nor without a justifiable excuse.'" Pate-Fires v. Astrue, 564 F.3d 935, 945 (8th Cir. 2009) (citations omitted). In this case, there is evidence that plaintiff's poor compliance with her medications was caused by her mental illness. In fact, state agency psychologist Dr. Cottone stated that plaintiff was "a very fragile claimant with poor compliance *that appears to be disability related*." (Tr. 296). As such, it was error for the ALJ to discredit plaintiff's complaints in large part due to her poor compliance with her prescribed medications.

The ALJ concluded that the medical treatment notes "do not document findings, rendered in the course of treatment, by a treating psychiatrist or psychologist, of any significant limitations of function, lasting twelve months in duration and despite treatment, since the alleged onset date." (Tr. 20). This finding is unsupported by the medical evidence of record discussed above.

In sum, the RFC formulated by the ALJ is not supported by substantial evidence. The ALJ improperly rejected the opinion of treating physician Dr. Baram, and relied on the opinion of non-examining state agency psychologist Dr. Cottone. The objective medical evidence reveals that plaintiff experiences significant psychiatric symptoms that interfere with her ability to function in the workplace. The vocational expert testimony relied upon by the ALJ was based upon this erroneous RFC. As such, the vocational expert's testimony in response to the ALJ's flawed hypothetical that plaintiff was able to perform work in the national economy is not supported by substantial evidence.

Accordingly, the undersigned recommends that this matter be reversed and remanded to the ALJ in order for the ALJ to accord the proper weight to the opinion of Dr. Baram, formulate

a new RFC consistent with the medical evidence of record, and obtain vocational testimony to determine whether plaintiff is capable of performing work in the national economy with her RFC.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that, pursuant to sentence four of 42 U.S.C. § 405 (g), the decision of the Commissioner be **reversed** and this case be **remanded** to the Commissioner for further proceedings consistent with this Report and Recommendation.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

Dated this  _25th_  day of June, 2012.

_Lewis M. Blanton_
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE